ATCHISON, T. & S. F. RY. CO. et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION, et al., Interveners).

(Commerce Court. March 31, 1913.)

No. 41.

COMMERCE (§ 85*)—POWERS OF INTERSTATE COMMERCE COMMISSION—REGULATION OF PRACTICES—PRE-COOLING AND PRE-ICING CITRUS FRUITS.

A practice was adopted by shippers of citrus fruits from Southern California, at the suggestion of the Department of Agriculture, of pre-cooling and pre-icing, by packing the fruit in a cooled warehouse, where it remained until thoroughly cooled and was then transferred through an inclosed way to the car, the bunkers of which were filled with large blocks of ice and all openings sealed before it was delivered to the railroad company for transportation. It was found that the fruit could be so transported to Eastern points without re-icing, where it arrived in better condition than under standard refrigeration furnished by the railroad companies and at a large saving in cost. *Held*, that an order of the Interstate Commerce Commission requiring the railroad companies to maintain in force a regulation permitting shippers to exercise the privilege of so pre-cooling and pre-icing shipments, including the filling of the car bunkers with ice, until the carriers should offer a substitute therefor which was fairly its equivalent in cost and efficiency, was an administrative order relating to a practice affecting rates, which was within the power and jurisdiction of the Commission, and not reviewable by the courts.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. § 85.*]

Petition by the Atchison, Topeka & Santa Fé Railway Company, the Southern Pacific Company, and the San Pedro, Los Angeles & Salt Lake Railroad Company against the United States of America, in which the Interstate Commerce Commission, the Arlington Heights Fruit Company and others, intervene. On final hearing. Petition dismissed.

For opinion of Interstate Commerce Commission see 20 Interst. Com. Com'n R. 106, and 23 Interst. Com. Com'n R. 267.

T. J. Norton and H. A. Scandrett, both of Chicago, Ill. (Robert Dunlap, of Chicago, Ill., C. W. Durbrow, of San Francisco, Cal., and Gardner Lathrop, of Chicago, Ill., on the brief), for petitioners.

Blackburn Esterline, Sp. Asst. Atty. Gen., of Washington, D. C., for the United States.

P. J. Farrell, of Washington, D. C., for Interstate Commerce Commission.

William E. Lamb, of Chicago, Ill. (Asa F. Call, of Los Angeles, Cal., on the brief), for intervening shippers.

-----

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Before KNAPP, Presiding Judge, and HUNT, CARLAND, and MACK, Associate Judges.

CARLAND, Judge. The questions to be decided in this case arise in this way: The petitioners, as well as other carriers, parties to the orders of the Interstate Commerce Commission hereinafter referred to, are and have been engaged in transporting from points in Southern California to various points in the United States citrus fruits in car load lots under refrigeration as well as under ventilation. At certain times of the year refrigeration is necessary to protect such shipments. Under standard refrigeration the oranges are loaded into a refrigerator car before either the fruit or the car has been artificially cooled; the boxes being so packed as to allow a free circulation of air between and around them. After being loaded, the car is taken to some gathering point, usually San Bernardino, upon the line of the Santa Fé and Colton upon the line of the Southern Pacific, when the shipments originate in Southern California, and the bunkers are there filled with ice. As the car journeys eastward, the bunkers are opened from time to time and replenished with additional ice.

The charges for refrigeration from California points in case of oranges and lemons are, per standard car, to the Missouri river, $60; to Chicago and similar points $62.50; to Buffalo and Pittsburgh, $72.-50; to New York, $75; and to Boston, $77.50. The Interstate Commerce Commission found that the cost of refrigeration to Chicago over the Santa Fé was $55 per car, and itemized said cost as follows: Cost of ice, $30; cost of repairs to bunkers, $5; hauling of ice, $20—and upon complaint in Arlington Heights Fruit Exchange et al. v. Southern Pacific Company et al., 20 Interst. Com. Com'n R. 106, found the charges for the transportation of oranges and lemons from California points under standard refrigeration to the points hereinbefore mentioned were reasonable.

On or about July 5, 1909, petitioners amended their refrigeration rules so as to provide as follows:

"On all car loads of citrus fruit pre-cooled and pre-iced, or pre-iced by shipper, offered for shipment with instructions 'Do not re-ice en route,' a charge of $30 per car of 32,000 pounds or less will be made, excess weight to be charged for at 9.375 cents per 100 pounds. On all cars handled under this rule, shipper will sign the following release, which must in all cases appear on shipping ticket and bill of lading and be copied on waybill by agent: 'The giving and acceptance of these special instructions from the shipper releases the initial carrier and its connections from all liability for damages caused by nonicing in transit or at destination.' In event any such car is re-iced in transit, the above charge of $30 will be canceled and the regular refrigeration rate applicable from San Bernardino or Los Angeles, Cal., to final destination, as shown in this tariff, will apply and must be added to the waybill for collection in the usual manner."

We take from the report of the Commission in the case above cited the following description of pre-cooling and pre-icing, referred to in the above amended rule:

"The system of refrigeration known as pre-cooling, which is essentially different from the standard refrigeration just considered, grew out of experiments conducted by the United States Department of Agriculture into the

handling of oranges. Those researches demonstrated that decay in oranges was due mainly to mechanical injury in the handling, and that if this could be avoided refrigeration was not necessary to prevent decay, but only to preserve the appearance of the fruit. While the greatest care is now exercised in the handling of the orange from the tree to the car, abrasions of the skin cannot be entirely avoided, and the experiments above referred to further demonstrated that in case of such injury the result was minimized by cooling the fruit at the earliest possible moment and maintaining thereafter a low temperature. It was more difficult to arrest and control the process of decay when it had once fairly set in than it was to check it at its inception. Pre-cooling grew out of these investigations of Prof. Powell and was tried by him in the course of his experiments. In actual practice it takes two forms, which may be termed pre-cooling by the shipper and pre-cooling by the railroad. These two methods are essentially different, and must be understood in order to intelligently appreciate the question presented.

"In pre-cooling by the shipper the basic idea is to bring the fruit under the influence of a low temperature at the earliest possible moment. The oranges are brought from the tree to the packing house and packed in a box which is immediately deposited in a cold room. Here the process of extracting the heat from the orange at once begins and gradually continues until at the end of from 24 to 48 hours all parts of the fruit in all parts of the box have been reduced to a uniform temperature of from 33° to 35° F. The box remains in this cold room at this temperature until it is to be loaded. The car is then connected with the room by a collapsible passageway, and the oranges are taken directly from the cold storage to the car, where they are placed, not with air spaces between, as in case of ordinary refrigeration or ventilation, but close together. The bunkers of the car are filled with large blocks of ice especially intended for that purpose, and the bunkers and vents are now sealed up so as to make the car as nearly air-tight as possible. All this is done by the packer at the packing house, and the car is now delivered to the railroad with instructions to transport to destination without re-icing and without breaking the seals.

"The cost of pre-cooling and pre-icing a car in this manner, including interest on the investment and depreciation of the plant, is from $30 to $35; a fair average being, perhaps, $32.50."

On January 14, 1911, the Commission found that a charge of $30 per car as provided in the above amended refrigeration rule, when the citrus fruit was pre-cooled and pre-iced by the shipper, was excessive and unreasonable, and ordered said charge to be reduced to $7.50 per car, and that no more than said last-named amount should be charged for a period of two years from April 15, 1911. Whereupon petitioners, on May 4, 1911, filed their original petition in this court to annul said order reducing the charge of $30 on pre-cooled and pre-iced citrus fruit. The case subsequently came on before this court on motion for a preliminary injunction, and the motion was denied; this court being of the opinion that the order of the Commission did not compel the carriers to permit shippers to pre-cool and pre-ice their fruit, and that the charge of $7.50 prescribed by the Commission was not unreasonable. Whereupon the Atchison, Topeka & Santa Fé Railway Company, the Southern Pacific Company, and the San Pedro, Los Angeles & Salt Lake Railroad Company filed with the Commission amendments to their tariffs, whereby what the carriers denominated the privilege of permitting the shippers of citrus fruit to pre-cool and pre-ice carload shipments was withdrawn; the carriers asserting in said amended tariffs that they had the exclusive right and control of furnishing and doing all icing and refrigeration of citrus fruits in all

cases where shippers did not specifically request or instruct shipments to move solely under ventilation.

Before said amendments became effective, however, the Commission entered orders from time to time suspending the operation and effect of said amendments, and a hearing upon said suspensions having been had, the Commission, on April 8, 1912 (23 Interst. Com. Com'n R. 267), held that the amendments to petitioners' tariffs purporting to withdraw the right and privilege of pre-cooling and pre-icing from the shipper were illegal and invalid, and ordered the petitioners to cancel said tariffs and supplements on or before May 20, 1912, and further ordered petitioners to continue in effect and maintain in force for a period of two years from April 8, 1912, a charge for pre-cooling and pre-icing oranges transported in carloads from shipping and producing points in Southern California to points in other states in the United States as designated in said above-mentioned tariffs, which should not exceed $7.50 per car. Whereupon, on June 4, 1912, petitioners filed an amended and supplemental petition, which is the one now being heard, wherein this court is asked to annul and set aside the orders of January 14, 1911, and April 8, 1912, so far as they compel petitioners to permit shippers of citrus fruit to pre-cool and pre-ice their shipments, and in so far as they reduce the charge from $30 per car to $7.50 per car.

Criticism is made of the use of the words "pre-cooling" and "pre-icing" in the report and orders of the Commission complained of. We think the confusion, if any, of the different terms is fully explained when we appreciate the fact that the Commission treated and held that the pre-cooling and pre-icing of citrus fruit for shipment, by the shippers, was all one act—that is, that pre-cooling and pre-icing was in fact a pre-cooling of the shipment—and when the Commission speaks of the charge for pre-cooling oranges it is to be understood that the word "pre-cooling" includes the act of pre-cooling as well as pre-icing. In order to free the case of undisputed questions, we quote from the brief of counsel for petitioners as follows:

"The carriers never claimed that the shippers have not a right to pre-cool their fruit in their own warehouses. They have all along admitted that the shipper may do as he pleases with his fruit before offering it to the carrier for transportation, save only that it be tendered to the carrier in a condition not inherently unfit. So, also, the carriers have always admitted that a shipper may pre-ice a shipment so long as he does it in his own package, as where he ices a box of fish or a keg of oysters, in which case the rate of transportation covers the entire package, including the ice as freight. But the carriers deny that the shipper has any right in law to ice or refrigerate the cars of the carriers, and thus take out of the hands of the carriers a part of the transportation service which the first section of the interstate commerce law requires them to provide; the 'refrigeration or icing' being specifically named in the law as included within the 'transportation' which the carrier is required to furnish."

Along the same line we may say that, if the orders of the Commission do give rise to discriminations between shippers, that is a matter concerning which petitioners may not complain. I. C. C. v. C., R. I. & P. Ry., 218 U. S. 88, 30 Sup. Ct. 651, 54 L. Ed. 946. We also have no doubt but that the withdrawal of the right to pre-cool and

pre-ice upon payment of $30 per car was a new practice which affected the rate upon citrus fruits, and that the Commission had full authority under section 15 to make the orders suspending such practice.   We think it also clearly appears from the record that, under the pre-cooling and pre-icing rate established by the Commission, the carrier gets a greater revenue per car than under standard refrigeration, and also a greater revenue per ton of ice and load than under the standard re-- frigeration rate.   The Commission found that in the case of a pre-- cooled and pre-iced shipment the average weight of ice carried from point of origin to destination was approximately 5,000 pounds; that under standard refrigeration the average weight of ice carried in the bunkers was approximately 8,000 pounds.   This would make the gross weight of the pre-cooled and pre-iced shipment, including ice and load, 38,000 pounds; while the gross weight of the refrigerated shipment, including ice and load, is about 35,200 pounds.   For transporting the former weight, the carrier, under the Commission's order, gets $387; for transporting the latter, under standard refrigeration rates, it gets $345.30.   These figures are based with reference to shipments from California to Chicago, and upon the fact that a car under standard refrigeration will carry about 27,200 pounds of revenue-paying load, while a car of pre-cooled and pre-iced fruit will load approximately 33,000 pounds.   This difference is caused by the fact that, where the fruit is pre-cooled and pre-iced, the boxes of fruit are placed close together in the car, whereas in shipments under standard refrigeration it is necessary that the boxes be not placed close together.   In view of the foregoing, we do not think that the petitioners have any valid com- plaint to make of the charge of $7.50 per car established by the Com- mission.

The case is thus narrowed down to a single question, namely: Have the shippers who desire to pre-cool their own fruit, which it is con- ceded they have the right to do, the right to place ice in the bunkers of the car for the purpose of making their pre-cooling effective and of preserving the fruit pre-cooled until it reaches its destination? or is the placing of the ice in the bunkers, where the fruit is pre-cooled by the shipper, a transportation service which the carrier has the right to perform to the exclusion of the shipper?

The claim of petitioners that the placing of ice in the cars by ship- pers of pre-cooled fruit is a transportation service is based upon the language of section 1 of the act to regulate commerce, which reads as follows:

" 'Transportation' shall include cars and other vehicles and all instru- mentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property trans- ported."

It must be observed that the language used with reference to icing is, "Icing  *  *  *  of property transported."   It is important, there- fore, that we consider the findings of the Commission with reference to the pre-cooling of fruit as practiced by the shipper and the exact conclusions reached by it as a result of such findings.   In the report

made in connection with the order of January 14, 1911, the Commission found as follows:

"It was suggested upon the argument that, inasmuch as these bunkers were filled with ice in case of pre-cooled shipments as well as in standard refrigeration, the carrier had the right to insist upon furnishing the ice, even though the grower might pre-cool his fruit. A moment's consideration will show that this contention is without merit, and would, if sustained, be without benefit to the carrier. The ice with which these bunkers are filled is not manufactured by the railroad at the point where it is used. It would be necessary to fill the bunkers with ice at San Bernardino or Colton and move the car when iced to the packing house. By the time it reached there the ice would have been partially exhausted, and this would render it necessary to open and refill the bunkers. This service should be performed in the most economical manner, and it is evident that the ice can be best supplied by the same parties who load the car and prepare it for shipment. The filling of the bunkers with ice is a part of the preparation of the car for shipment, and is not a part of the transportation service which is rendered by the railroads. It should also be noted that great importance is attached to the filling of the bunker completely and with large cakes of ice which will melt slowly.

"To allow the carrier to fill these bunkers would be a source of no profit to it, and would introduce an element of discord into the transaction If the car arrived in bad condition, the shipper would be apt to say that the bunkers had not been properly re-iced or that the car had not been properly sealed. That uncertainty is removed where the shipper makes the car ready for transportation and the service rendered by the carrier is purely one of transportation. It seems clear that the carrier itself would prefer that this icing should be done by the shipper rather than attempt to do it at anything like what would be the actual cost to the shipper plus a reasonable profit to the carrier. * * * The matter, therefore, stands like this: The United States government has suggested, and these shippers, acting upon the suggestion, have perfected, a system of handling these oranges by which they can be carried during all heated months to destination at an expense of $32.50 per car, approximately. The carriers offer an alternative system at a charge of $62.50, or probably slightly more on the average, and this charge for that service has been found to be reasonable. May the carrier insist that the shipper shall pay this higher charge, or has the shipper the right to avail himself of the modern method?" 20 Interst. Com. Com'n R. 106.

In the report made in connection with the order of April 8, 1912, the Commission found as follows:

"But, while in our opinion the process of pre-cooling as above defined is not a transportation service, since it is performed by the shipper and cannot be performed by the carrier, it does nevertheless take the place of refrigeration, and if these defendants had provided and were prepared to furnish refrigeration which would answer the same purpose as pre-cooling at substantially the same price, then it might perhaps be held that the shipper should avail himself of the refrigeration which the carrier was prepared to furnish; but that situation is not here presented. This record shows that the cost to the shipper of refrigeration when furnished by the railroad in any one of the several forms offered is upon the average from $30 to $35 a car greater than the cost of pre-cooling. The complainants urge that they have the legal right to pre-cool and that this right cannot be denied them by this Commission. Without expressing any opinion upon that proposition, we are clear that until the carriers offer a substitute for pre-cooling which is fairly its equivalent in cost and in efficiency, it is the right of the shipper to avail himself of this privilege. As stated in our former opinion, the difference in expense applied to all the car loads of citrus fruits which are now refrigerated in transit would equal $600,000 per year." 23 Interst. Com. Com'n R. 267.

The result of the whole matter is that the Commission found that the pre-cooling service performed by the shipper could not be performed by the petitioners for the reasons stated in the report, and that petitioners offer no substitute for such pre-cooling which is fairly equivalent in cost and in efficiency. The Commission expressed no opinion upon the absolute legal right of the shipper to pre-cool (including icing) his fruit, but decided only that, until petitioners offer a substitute for pre-cooling as practiced by the shipper which is fairly its equivalent in cost and in efficiency, it was the right of the shipper to avail himself of this privilege. We think this was an administrative ruling, clearly within the power and jurisdiction of the Commission, and with which this court may not interfere.

As it is conceded by counsel for the petitioners that the shippers have the right to pre-cool their fruit, with the exception of placing ice in the bunkers of the car in connection with such pre-cooling, and that it is not necessary to furnish any different car than the one provided for standard refrigeration or pre-cooling by the carrier, and that the ice placed in the car is furnished by the shipper prior to the time at which the car is delivered to the carrier for transportation, the matter of pre-cooling by the shippers becomes a practice which the Commission could condemn or indorse without interference by the courts.

The petition, therefore, will be dismissed, and it is so ordered.